UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
REGINALD GOUSSE,

                    Petitioner,

                                          MEMORANDUM AND ORDER
          -against-                       19-CV-1607(JS)

SUPERINTENDENT,
WENDE CORRECTIONAL FACILITY,

                    Respondent.
------------------------------------X
APPEARANCES
For Petitioner:     Johnathan I. Edelstein, Esq.
                    Edelstein & Grossman
                    501 Fifth Avenue, Suite 514
                    New York, New York 10017

For Respondent:     Daniel Bresnahan, Esq.
                    Sarah S. Rabinowitz, Esq.
                    Nassau County District Attorney's Office
                    262 Old Country Road
                    Mineola, New York 11501


SEYBERT, District Judge:

          Pending before the Court is Petitioner Reginald Gousse's

("Petitioner") petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254. (Pet., D.E. 1.) Following a jury trial, Petitioner

was convicted of one count of New York Penal Law § 125.27, Murder

in the First Degree; one count of New York Penal Law

§ 110/160.15(2), Attempted Robbery in the First Degree; and one

count of New York Penal Law § 190.25, Criminal Impersonation in

the First Degree. Petitioner raises seven issues: (1) trial

counsel was ineffective; (2) the prosecution failed to disclose

Brady material; (3) newly discovered evidence demonstrates his

actual innocence; (4) the trial court erred by failing to suppress identification testimony; (5) the trial court's <u>Molineux</u> ruling deprived him of due process and a fair trial; (6) the trial court's <u>Sandoval</u> ruling denied him of due process and a fair trial; and (7) appellate counsel was ineffective. (Pet., ECF pp. 8-19.) For the following reasons, the Petition is DENIED in its entirety.

BACKGROUND

I. <u>The Offense Conduct</u>

James Gottlieb ("Gottlieb") was murdered on January 5, 2005, in Franklin Square, New York. (Tr. 229:16-17; 235:11-15.)[1] In January 2005, Gottlieb was employed as an assistant branch manager at HSBC bank in Cedarhurst, New York. (Tr. 228:6-7; 241:5-7; 244:1-7.) After closing the bank at approximately 6:30 p.m. on Wednesday, January 5, 2005, Gottlieb was driving home from work. (Tr. 230:8-13.) A 2003 or 2004 black Ford Expedition SUV ("Expedition") with a siren and revolving light, driven by Petitioner, stopped Gottlieb's car across the street from 190 Semton Boulevard, Franklin Square, New York. (Tr. 293:16-20; 295:15-19; 296:17-23; 297:3-298:5; 348:1-12.) Petitioner exited

---

[1] The underlying state trial started on February 27, 2006 and ended on March 22, 2006. Transcripts ("Tr.") can be found as follows: Hearing ("Hr'g") Transcripts pp. 1-138, D.E. 13, and pp. 139-341, D.E. 13-1. Trial ("Tr.") Transcripts pp. 1-171, D.E. 13-2; pp. 172-340, D.E. 13-3; pp. 341-539, D.E. 13-4; pp. 540-629, D.E. 13-5; pp. 637-712, D.E. 13-6; pp. 713-855, D.E. 13-7; pp. 856-1016, D.E. 13-8; pp. 1017-1139, D.E. 13-9; and pp. 1140-1265, D.E. 13-11. Sentencing ("Sent'g") Transcript, D.E. 13-10.

the Expedition and approached Gottlieb's vehicle, a 1998 maroon
Mercury sedan, and told Gottlieb to get out of the car, give
Petitioner his keys, and put his hands behind his back to be
handcuffed.  (Tr. 229:7-8; 297:5-13; 348:1-4.)  Petitioner was
wearing what appeared to be a dark uniform and boots, similar to
a police uniform.  (Tr. 298:22-25.)

          Gottlieb refused to comply with Petitioner's requests
for his keys and to put his hands behind his back, and instead
repeatedly asked Petitioner for his identification.  (Tr. 298:6-
11.)  Petitioner and Gottlieb continued arguing as Petitioner
followed Gottlieb to the front door of 190 Semton Boulevard.  (Tr.
299:23-300:3.)  Steps away from the front door of the house,
Petitioner struck Gottlieb in the head with a handgun causing
Gottlieb to fall to the ground.  (Tr. 300:5-301:7.)  Petitioner
then shot Gottlieb two times, once in the right arm and once in
the left leg, and sped off in the Expedition.  (Tr. 302:15-16;
303:5-8; 376:21-377:5.)

          Gottlieb knocked on the door to 190 Semton Boulevard and
asked for someone to please help him.  (Tr. 303:13-18.)  Anthony
Giardulo ("Giardulo"), who lived at 190 Semton Boulevard and had
been watching the altercation between Gottlieb and Petitioner
until he closed his front door after the first gunshot, opened the
door to help Gottlieb and called 911.  (Tr. 303:20-23; 304:14.)

Gottlieb appeared to be in shock and walked back to his car and laid down in his car.  (Tr. 304:19-24.)

Detective Ricky Frassetti ("Det. Frassetti") was the first member of the Nassau County Police Department ("NCPD") to arrive on the scene.  (Tr. 274:18.)  Gottlieb told Det. Frassetti that he had been shot and thought that the man was trying to take his car, then pointed towards Hempstead Turnpike and said that he went that way.  (Tr. 276:16-20.)  Ambulance Medical Technician Joseph Rice ("A.M.T. Rice") arrived moments later and began working on Gottlieb.  (Tr. 277:3-7.)  Gottlieb told A.M.T. Rice a black man had shot him.  (Tr. 277:23-278:5.)  A.M.T. Rice transported Gottlieb to Mercy Medical Center, and Gottlieb was pronounced dead shortly thereafter.  (Tr. 381:21; 383:11-13.)

Detective John McHugh ("Det. McHugh") was the lead homicide detective assigned to Gottlieb's murder investigation. (Tr. 1019:3-5.)  As part of the investigation, Det. McHugh spoke with eyewitness Giardulo.  (Tr. 1020:8-13.)  Giardulo described the perpetrator as a light skinned black male, about thirty years old, about five foot six inches tall, clean shaven, and wearing dark colored police or military-type clothing with black boots. (Tr. 297:14-298:25; 1021:9-19.)  Det. McHugh also spoke with witnesses Daniel Bellucci ("Bellucci") and Nancy Montenegro ("Montenegro"), who both described the perpetrator's vehicle as a 2003 or 2004 black Ford Expedition.  (Tr. 348:1-14; 398:18-22.)

Later, on January 15, 2005, a defense attorney named Mitchell Dinnerstein ("Dinnerstein") contacted the NCPD and spoke with Det. McHugh.  (Hr'g Tr. 16:12-15.)  Dinnerstein defended a murder trial in Queens County in May 1999, and during that trial, Petitioner, while a prosecution witness, testified pursuant to a cooperation agreement.  (Tr. 880:14-881:22.)  During his testimony, Petitioner admitted that he had committed a crime involving the robbery of a Staples store, and Dinnerstein believed that the facts of that robbery were similar in nature to the facts surrounding Gottlieb's murder.  (Tr. 902:3-914:20.)

After receiving the information from Dinnerstein, Det. McHugh began investigating Petitioner.  (Tr. 1027:3-13.)  Det. McHugh learned that Petitioner had rented a 2004 black Ford Expedition from Hertz at 2:21 p.m. on January 5, 2005 and returned it at 10:57 a.m. on January 6, 2005.  (Tr. 1032:1-4; 804:7-17; 806:2-6; 807:4-6.)  On January 20, 2005, Frank Kassel ("Kassel") of the NCPD Fleet Services Bureau examined the Expedition and discovered evidence that supported that an emergency light or siren has been installed and removed.  (Tr. 916:11-12; 919:21-23; 921:6-10.)  Also on January 20, 2005, Det. McHugh put Petitioner's photograph in a photo array and showed it to Giardulo, who identified Petitioner as the individual who had shot Gottlieb. (Tr. 1027:14-19; 306:7-24.)  Petitioner was arrested on February 9, 2005.  (Tr. 582:15-583:6.)  The next day, Giardulo

identified Petitioner again in a lineup.  (Tr. 307:22-308:1; 309:4-12.)

II. <u>The Suppression Hearing and Trial</u>

On October 28, 2005, a suppression hearing was held in New York Supreme Court, Nassau County before the Honorable John L. Kase to address identification procedures, including a photo array and lineup. (<u>See</u> Hr'g Tr.)

Petitioner's jury trial began on February 27, 2006 before the Honorable Jerald S. Carter.  (Tr. at 1.)  Prior to trial, the court granted, in part, the prosecution's <u>Molineux</u> application to prove Petitioner's identity.  The court permitted the prosecution to enter evidence of Petitioner's prior robbery conviction, the robbery of the Staples from 1998 ("1998 Staples robbery"), which included a trial transcript of Petitioner's testimony from the above-mentioned murder trial where he testified to the details of the 1998 Staples robbery.  (Tr. 5:3-14; 51:17-52:12.)  The court also permitted the prosecution to present evidence found in a Chevrolet Lumina, a vehicle that was once previously registered to Petitioner but had been abandoned, which revealed alterations that were similar to those found in the Expedition Petitioner had rented from Hertz.  (Tr. 73:6-19; 11:11-19.)

At the pre-trial <u>Sandoval</u> hearing, the court ruled that should Petitioner testify, the prosecution would be permitted to

cross-examine him regarding the underlying facts of the 1998 Staples robbery, and the existence, but not the underlying facts, of one other attempted robbery conviction from 1992. (See generally Tr. 61:18-63:1.)

During the trial, the prosecution presented testimony of numerous law enforcement witnesses involved in the investigation, expert witnesses, and civilian eyewitnesses. (See Tr. 225:18-1012:4). Giardulo testified that on January 5, 2005 at around 7:00 p.m. he heard a police siren, so he opened his front door and looked out the window of his outer door. (Tr. 293:16-295:25.) Giardulo observed Petitioner exit a black SUV with a blue and white revolving light on the dashboard and approach Gottlieb's red car. (Tr. 296:17-297:8.)

Giardulo testified that Petitioner and Gottlieb argued back and forth, Petitioner telling Gottlieb to give his keys and put his hands behind his back, and Gottlieb asking for Petitioner's identification, as Gottlieb walked towards Giardulo's front door while Petitioner followed. (Tr. 297:11-300:3.) The area in front of Giardulo's house was well-lit as he still had his Christmas lights on his house in addition to three other lights affixed to the front of his house, and, as such, he was able to clearly see Gottlieb and Petitioner. (Tr. 301:13-24.) Giardulo testified that he saw Petitioner strike Gottlieb in the head with a gun, heard one gunshot, and then he closed his door. (Tr. 300:5-

302:20.)  Giardulo then heard two more gunshots and a car speeding away.  (Tr. 303:5-8.)  Giardulo identified Petitioner in court, and testified that he had previously identified Petitioner in both a photo array and lineup.  (Tr. 297:23-298:5; 306:7-21; 307:22-309:12.)

Two of Giardulo's neighbors from Semton Boulevard also testified, Bellucci and Montenegro.  Both Bellucci and Montenegro testified that they were home at about 7:00 p.m. on January 5, 2005 when they heard a shot or a firecracker outside.  (Tr. 342:9-11; 345:14-16; 391:14; 395:15-20.)  Bellucci testified that he heard three gunshots then looked outside his window facing Semton Boulevard.  (Tr. 347:17-22.)  Bellucci, a self-described auto body man who repaired cars for fifteen years, recognized a black 2003 or 2004 Ford Expedition, with a flashing blue and white light on the dashboard, parked behind Gottlieb's maroon-red Mercury sedan. (Tr. 344:1-3; 348:1-14.)  Bellucci observed Petitioner approach the Mercury sedan and look inside before getting into the Expedition.  (Tr. 350:2-5; 351:10-12.)  Montenegro also testified that she has family in the automobile industry and can distinguish makes and models of different cars, and she observed a black Ford Expedition racing down Semton Boulevard.  (Tr. 394:16-395:1; 398:18-25.)

Dr. Michael DeMartino ("Dr. DeMartino"), Deputy Medical Examiner at the Nassau County Medical Examiner's Office, testified

that he performed the autopsy on Gottlieb.    (Tr. 401:24-402:2;
406:13-15.)    Dr. DeMartino testified he observed Gottlieb had a
blunt force injury that caused lacerations to the left side of his
face and nose, likely caused by an elongated narrow object.   (Tr.
407:16-24; 409:3-8.)    Dr. DeMartino also testified that Gottlieb
suffered two gunshot wounds, one to his left calf, and one to his
right  forearm.     (Tr.  409:25-410:2.)     The  gunshot  wound  to
Gottlieb's  right  forearm  severed  an  artery,  which  was  a  fatal
injury.   (Tr. 413:5-17.)

       The prosecution's theory at trial was that this crime
was part of a distinctive pattern that Petitioner had committed
once before during the 1998 Staples robbery.  (Tr. 208:18-23.)   To
demonstrate  Petitioner's  pattern,  or  modus  operandi,  the
prosecution entered into evidence the transcript of Petitioner's
prior testimony where he detailed each step in the 1998 Staples
robbery.   (See generally Tr. 902:3-914:20.)

       During the Staples robbery, Petitioner approached the
Staples general manager in a vehicle in which he had installed a
red dome light, armed with a bounty hunter shield, handcuffs, a
scanner, and a revolver.   (Tr. 903:3-12.)   Petitioner placed the
manager in handcuffs, brought the manager back to his residence,
had the manager tell him the Staples alarm code, and then went
back to the Staples to remove merchandise.   (Tr. 903:12-17.)   These

facts were part of Petitioner's admitted policeman routine.  (Tr. 905:19-21.)

In the transcript, Petitioner also detailed how he prepared to rob the Staples.  Petitioner determined who the manager was and which car belonged to the manager, brought a box cutter the day of the robbery and slashed the manager's car tires, then waited for the manager to come out of the store and pulled him over by pretending to be a police officer.  (Tr. 907:9-909:15.)

The prosecution presented evidence demonstrating the similarities between the 1998 Staples robbery and the instant crime, including testimony from Gottlieb's co-worker, and fellow bank manager, Richard Slipka ("Slipka').  (See generally Tr. 238:11-266:21.)  Slipka testified that both he and Gottlieb were able to both open and close the bank, and both had the alarm codes. (Tr. 244:1-21.)  On January 5, 2005, Slipka testified that instead of going home after work, he went across the street to a bar for a drink with another co-worker.  (Tr. 247:12-18.)  When Slipka returned to his car, he drove a couple miles before realizing his tire had been slashed right above the rim.  (Tr. 250:24-251:16.) Slipka gave his tire to Detective Scott Kovar, of the Forensic Evidence Bureau, who determined that the slash was a four-inch diagonal cut consistent with being made by a sharp object.  (Tr. 634:8-15; 637:22-638:9.)

The prosecution offered into evidence a photocopy of Petitioner's credit card to demonstrate the purchases he made to prepare for the crime.[2]  (Tr. 600:20-24.)  Kenneth Epstein, owner of Mesk Police Equipment Corp., a police equipment store, testified that Petitioner had ordered a custom thigh gun holster for a .40 caliber Glock, which ultimately was not ready by January 5, 2005, and the order was later cancelled.  (Tr. 979:10-18; 982:18-23.)  Michael Thseldar, a Radio Shack employee, testified that Petitioner bought a police scanner on January 3, 2005.  (Tr. 996:11-12; 999:14-1000:9.)

Kassel, of the NCPD Fleet Services Bureau, testified that he examined the Expedition.  (Tr. 916:9-12; 919:21-23.)  He testified that there was evidence that an emergency light or siren had been installed and removed from the Expedition.  (Tr. 921:6-10.)  The fins on the oil cooler were dented, which was consistent with a siren being placed there, and insulation on wires had been pulled back, which was also consistent with connecting a siren.  (Tr. 924:8-10; 926:19-927:3.)  Kassel also testified that he examined a 1997 gray Chevrolet Lumina that was previously registered to Petitioner.  (Tr. 941:8-16; 737:11-19.)  Kassel

---

[2] The photocopy of Petitioner's credit card was entered into evidence over an objection by defense counsel that the photocopy violated the best evidence rule.  (Tr. 600:2-9.)  The whereabouts of the actual credit card were unknown at the time of trial, and thus the prosecution offered the photocopy as the best evidence at the time.  (Tr. 599:22-600:9.)

explained that the Lumina was altered in a very similar way to the Expedition.  (Tr. 941:21-24.)

     At the close of the prosecution's case, defense counsel moved for a trial order of dismissal pursuant to New York Criminal Procedure Law § 290.10, which was denied by the court.  (Tr. 1012:17-1013:9.)  Defense counsel presented one witness, Det. McHugh, the lead homicide detective on the case.  (Tr. 1018:18-1070:1.)  The defense theory was that another person, named Amili Chambers ("Chambers") was the perpetrator of the crime.[3]  (Tr. 216:15-217:1.)  Throughout the prosecution's case, defense counsel cross-examined witnesses regarding Chambers.  Chambers owned a 2005 black Ford Expedition, and there was a stipulation entered by both parties that Detective James Carroll viewed a 2005 Ford Expedition, registered to Chambers, but did not look inside the car, or engine.[4]  (Tr. 718:19-719:3.)

_____

[3] Prior to trial, on October 12, 2005, Assistant District Attorney Mary Biunno ("ADA Biunno") provided Brady materials to defense counsel, which included information regarding numerous leads, and specifically the investigation into Lead # 182, Amili Chambers.  (See Affirm. in Opp. to 2d Mot. to Vacate J., D.E. 14-7, ¶¶ 26, 31 and ECF pp. 61, 111-13.)  The NCPD received a tip from an individual named Lorence Williams that Chambers has a black SUV with lights and sirens, that he has a gun and pulls people over, and had confessed to the crime.  (Tr. 613:2-17.)  The trial court did not allow the substance of the tip into evidence because it was hearsay.  (Tr. 715:9-12.)

[4] During defense counsel's cross examination of Detective Carroll, defense counsel began a line of questioning regarding Chambers.  (Tr. 611:9-10.)  The prosecution objected, and there was a lengthy sidebar regarding the admissibility of third-party

Defense counsel questioned Det. McHugh regarding his investigation into Chambers. Det. McHugh testified that he did not show Chambers' photograph to any of the civilian witnesses in the case. (Tr. 1030:10-25.) Det. McHugh also testified that he inspected Chambers' 2005 Ford Expedition and observed that there was a siren attached to the front portion of the engine compartment, and that Chambers was completely cooperative. (Tr. 1051:15-19; 1062:2-3.) At trial, there was also testimony that Chambers was six-foot-seven inches tall, which is about a foot taller than Petitioner and Giardulo's description, and that he had an alibi for the time of Gottlieb's murder. (Tr. 297:14-20; 726:4-8; 1049:4-1050:17.) Det. McHugh's direct examination testimony regarding Chambers' alibi was as follows:

> Q:   Did you ever learn where Amili Chambers was, on the evening of January 5, 2005?
>
> A:   To the best of my knowledge, he was at work.
>
> Q:   Where was work?
>
> A:   Either in Brooklyn or Queens.

---

culpability evidence relating to Chambers, specifically with respect to the substance of the tip received by law enforcement. (See generally Tr. 611:20-628:2.) The trial court suspended questioning of Detective Carroll pending its decision on the admissibility of certain evidence of third-party culpability. (Tr. 632:1-5.) The trial court ultimately decided to allow questioning regarding the inspection of Chambers vehicle, but not the tip itself as it was inadmissible hearsay. Thus, rather than recall Detective Carroll to the stand, the parties agreed to enter into a stipulation. (Tr. 714:8-717:5.)

Q:   Do you know specifically where he was that night?

A:   No, I do not.

Q:   When you say, work, he didn't work in a particular office; is that right?

A:   I don't know if he reported to an office.  He was a field worker.

Q:   He would go out in the field and repair computers. Is that what he did?

A:   That's correct.

Q:   He would move around?

A:   Brooklyn and Queens; yes.

Q:   You have no idea where he was at roughly seven o'clock in the evening, on January 5, 2005?

     Mr. Klein: Objection.

     The Court: Sustained.

A:   He was working.  Where exactly he was, in Brooklyn or Queens, I do not know.

Q:   Did you ever ask him where he was, specifically, that night?

     Mr. Klein: Objection.

     The Court: Sustained.

A:   Yes, I did.

     The Court: All right.  Go ahead.

Q:   Where was he?

A:   He was at a bank location on, I believe it was Liberty Avenue, in Queens.

Q:   Did you go to that location?

A:   Yes, I did.

Q:   Did you speak to anyone there?

A:   Yes, I did.

Q:   Who did you speak to?

A:   The branch manager.

Q:   What was his name?

A:   I don't recall her name.

(Tr. 1049:4-1050:17.)

At the close of all the evidence, defense counsel made another motion for a trial order of dismissal, which the court also denied. (Tr. 1083:9-22.) Defense counsel and the prosecution delivered their summations to the jury, the court instructed the jury on the law, and the jury deliberated. (Tr. 1084:7-1139:25.) The jury convicted Petitioner of Murder in the First Degree, Attempted Robbery in the First Degree, and Criminal Impersonation in the First Degree. (Tr. 1257:20-1258:12.)

III. <u>The Sentence</u>

On April 19, 2006, Petitioner was sentenced by the court. (<u>See</u> Sent'g Tr., D.E. 13-10.) The prosecution requested life in prison without parole, the maximum sentence permissible under the law. (Sent'g Tr. 14:8-14.) Defense counsel and Petitioner both addressed the court, and Petitioner maintained his innocence. (Sent'g Tr. 14:18-20:1.) The court sentenced Petitioner to the maximum sentence of life imprisonment without possibility of

parole on the murder in the first degree charge; fifteen years imprisonment with five years post-release supervision on charges of attempted robbery in the first degree; and an indeterminate sentence of one-and-one-third to four years on the charge of criminal impersonation. (Sent'g Tr. 24:15-25:8.) All sentences were ordered to run concurrently. (Sent'g Tr. 25:8-9.)

IV. <u>The Appeal</u>

On December 21, 2006, Petitioner, through counsel, appealed his conviction and sentence to the Second Department. (Appellant Br., D.E. 15.) On direct appeal, Petitioner argued that: (1) he was deprived of a fair trial by the trial court's admission of <u>Molineux</u> evidence (Appellant Br. at 32-36; (2) the trial court's <u>Sandoval</u> ruling deprived him of due process and the right to testify on his own behalf (Appellant Br. at 37-40); (3) the court erred by failing to suppress the line-up identification (Appellant Br. at 41-42); (4) a <u>Trowbridge</u> error deprived him of a fair trial (Appellant Br. at 43-47a0; and (5) he was deprived of a fair trial when the court refused to permit him to call Kevin Cooney ("Cooney") as a witness[5] (Appellant Br. at 48-50).

---

[5] Cooney was a witness proffered by defense counsel. (Tr. 850:25-851:6.) According to defense counsel, Cooney worked at a bank that shared a parking lot with the bank where Gottlieb worked. (Tr. 851:12-14.) Defense counsel anticipated that Cooney would testify that the day before the murder, on January 4, 2005, he was followed home by a black man driving a dark SUV. (Tr. 851:18-20.) However, Cooney did not identify a vehicle, he didn't see the individual driving the vehicle, and

16

The Second Department affirmed the judgment.  People v. Gousse, 43 A.D.3d 958, 958, 841 N.Y.S. 2d 383, 384 (2d Dep't 2007). Regarding the Molineux claim, the Second Department found that "[e]vidence of the defendant's conviction arising from his involvement in the '1998 Staples case' was properly admitted to establish his identity as the perpetrator of the instant crime." Id. (citations omitted).  With respect to Petitioner's Sandoval claim, the Second Department found that "[l]ikewise, the court properly exercised its discretion with respect to its various Sandoval rulings." Id. (citations omitted).

As to Petitioner's claim that the hearing court erred by failing to suppress the lineup identification, the Second Department found that "[t]he hearing court properly denied that branch of the defendant's motion which was to suppress identification evidence." Id. (citations omitted).  Regarding the alleged Trowbridge error, the Appellate Division held that "defendant's contention that the detective's testimony regarding the lineup improperly bolstered the witness's identification testimony is not preserved for appellate review, and we decline to review it in the exercise of our interest of justice jurisdiction." Id. (internal citations omitted).  Finally, with respect to

---

there was no contact between the individual in the vehicle and Cooney.  (Tr. 853:6-20.)  The Court ruled that Cooney was not allowed to testify.  (Tr. 855:1-2.)

Petitioner's claim regarding witness Cooney, the court held that "defendant's remaining contention is without merit."  Id.

Petitioner, through counsel, sought leave to appeal to the New York State Court of Appeals, which was denied on July 8, 2008.  (See People v. Gousse, 10 N.Y.3d 959, 959, 893 N.E.3d 449, 449, 863 N.Y.S. 2d 143, 143 (2008); D.E. 16-3.)

V. Seven Motions for Writ of Error Coram Nobis

The Court notes that Petitioner filed seven motions for writ of error coram nobis, all of which were denied by the Appellate Division for failure to establish that he was denied the effective assistance of appellate counsel.

In his first motion, Petitioner argued that his appellate counsel's representation on direct appeal was deficient and prejudicial, due to weak arguments made in support of the claims raised on direct appeal, and because appellate counsel failed to raise two purportedly meritorious issues: (1) the prosecutor committed prosecutorial misconduct by making improper remarks during summation; and (2) trial counsel was ineffective for (a) failure to request a limiting instruction regarding Molineux evidence; (b) failure to object to an improper Molineux charge conference; (c) failure to object to the Molineux jury instruction; and (d) failure to object during the prosecution summation.  (See Mem. in Supp. of 1st Writ of Error Coram Nobis, D.E. 15-3, at pp. 38-71.)

Petitioner further argued in his six later motions that appellate counsel was ineffective for failing to bring the following arguments on direct appeal:  (1) that the prosecution committed misconduct for failure to correct false testimony by Detective McHugh; (2) that trial counsel was ineffective for failure to make a sufficiently detailed motion for a trial order of dismissal on the grounds that there was insufficient evidence of intent to kill; (3) that the prosecution violated its <u>Brady</u> obligations by failing to disclose photographs of Chambers' vehicle; (4) that the trial court erred by admitting a gun for illustrative purposes only; (5) that the trial court erred by admitting a photocopy of Petitioner's credit card, rather than the actual credit card, in violation of the best evidence rule; (6) that the trial court erred by precluding defense counsel from cross-examining witnesses regarding the details of how police learned about Amili Chambers; and (7) that trial counsel was ineffective for failure to object to the trial court's instruction that Petitioner be required to wear leg shackles during his criminal trial.  (<u>See</u> <u>generally</u> Mem. in Supp. 2d Writ of Error Coram Nobis, D.E. 15-10; Mem. in Supp. of 3rd Writ of Error Coram Nobis, D.E. 15-14; Suppl. Pleading in Supp. 3rd Writ of Error Coram Nobis, D.E. 15-15; Aff. in Supp. 4th Writ of Error Coram Nobis, D.E. 15-19; Aff. in Supp. 5th Writ of Error Coram Nobis, D.E. 15-22; Aff. in Supp. 6th Writ of Error Coram Nobis, D.E. 15-25; Aff.

in Supp. 7th Writ of Error Coram Nobis, D.E. 15-28.)  As stated herein, all seven motions for writ of error coram nobis were denied.

## VI. Two Motions to Vacate Judgment

Petitioner filed two motions before the trial court to vacate his judgment of conviction and set aside the verdict, pursuant to New York Criminal Procedure Law § 440.10.  In his first pro se motion, Petitioner argued that: (1) defense counsel was ineffective for failing to adequately investigate a third-party culpability defense and presenting a perjurious police witness; (2) defense counsel was ineffective for failing to obtain critical Brady material that was central to the asserted third-party culpability defense; and (3) he was deprived due process when the prosecution summation made references to Det. McHugh's allegedly perjured testimony. (See 1st Mot. to Vacate J., D.E. 14.)  The trial court denied the motion in its entirety, and, with respect to Petitioner's ineffective assistance of counsel claims, held that "[u]pon a review of the record  and counsel's representation of defendant in totality and at the time of the representation, this court finds that the defendant received adequate counsel under either the federal test of a deficient performance and prejudiced that defendant or the more stringent state test of meaningful representation." (May 11, 2011 Order, D.E. 14-2, ECF p. 4.)

Thereafter, Petitioner filed a pro se motion for leave to appeal the trial court's 440 decision to the Second Department, pursuant to CPL 450.15 and 460.15.  (See Mot. for Leave to Appeal, D.E. 15-6, ECF p. 1).  The Appellate Division denied Petitioner's application.  (See Dec. 12, 2011 Dec. & Order, D.E. 15-9.)

On December 22, 2017, Petitioner filed a motion through counsel to vacate judgment pursuant to CPL § 440.10(1) (g) and (h) in the trial court, and argued that: (1) he is entitled to a new trial based on newly discovered evidence; (2) he is entitled to a new trial due to nondisclosure of Brady/Giglio material; and (3) trial counsel was ineffective for failing to present certain evidence.  (See 2d Mot. to Vacate J., D.E. 14-3, at 11-19.)

The Supreme Court, Nassau County issued an order finding that Petitioner's claims were "largely procedurally barred and uniformly meritless." (See Nov. 29, 2018 Order, D.E. 14-9.)  In addition, the court stated that "defendant's claims of newly discovered evidence are without merit."  (Id. at 2.)  Regarding Petitioner's Brady/Giglio claims, the court ruled that "no Brady/Giglio material was withheld from defendant . . . and the remaining information that defendant erroneously characterizes as Brady/Giglio evidence is not material, did not exculpate him, and he was not prejudiced by the alleged nondisclosure because there is no reasonable probability that the result of the proceeding would have been different had the information been disclosed."

(Id. at 2.)  Finally, the court ruled that "as the Supreme Court
has previously held, trial counsel was not ineffective, and
provided meaningful representation."  (Id. at 3.)

This Petition followed.

DISCUSSION

I. The Legal Standard

Congress enacted the Antiterrorism and Effective Death
Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996),
to restrict "the power of federal courts to grant writs of habeas
corpus to state prisoners."  Williams v. Taylor, 529 U.S. 362,
399, 120 S. Ct. 1495, 1516, 146 L. Ed. 2d 389 (2000).  A state
prisoner seeking habeas corpus relief under Section 2254 must show
that he is "in custody in violation of the Constitution or laws or
treaties of the United States."  28 U.S.C. § 2254(a).  Section
2254, as amended by AEDPA, provides, in part, that:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted
> with respect to any claims that was not
> adjudicated on the merits in State court
> proceedings unless the adjudication of the
> claim--(1) resulted in a decision that was
> contrary to, or involved an unreasonable
> application of, clearly established [f]ederal
> law, as determined by the Supreme Court of the
> United States.

28 U.S.C. § 2254.  AEDPA established a deferential standard of
relief, seeking to "avoid[ ] unnecessarily 'disturbing the State's

significant interest in repose for concluded litigation, denying
society the right to punish some admitted offenders, and intruding
on state sovereignty to a degree matched by few exercises of
federal judicial authority.'" Virginia v. LeBlanc, 137 S. Ct.
1726, 1729, 198 L. Ed. 2d 186 (2017) (quoting Harrington v.
Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 787, 178 L.Ed. 2d 624
(2011)) (brackets omitted). Accordingly, a habeas corpus petition
is not a vehicle to relitigate every issue previously determined
in state court. Herrara v. Collins, 506 U.S. 390, 401, 113 S. Ct.
853, 861, 122 L. Ed. 2d 203 (1993). Ultimately, "the petitioner
bears the burden of proving by a preponderance of the evidence
that his constitutional rights have been violated." Jones v.
Vacco, 126 F. 3d 408, 415 (2d Cir. 1997); see also Hawkins v.
Costello, 460 F. 3d 238, 246 (2d Cir. 2006).

    Therefore, a federal court may not grant a writ of
habeas corpus unless the state court's adjudication of the claim
either: (1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United
States, or (2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in the State court proceeding. 28 U.S.C. § 2254(d).
The Supreme Court has construed AEDPA "to give independent meaning
to 'contrary [to] and 'unreasonable.'" Jones v. Stinson, 229 F.3d

112, 119 (2d Cir. 2000).  A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case different than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13, 120 S. Ct. at 1523.  A decision involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413, 120 S. Ct. at 1523.  This standard does not require that all reasonable jurists agree that the state court was wrong; rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).  AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'"  Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66, 132 S. Ct. 490, 491, 181 L. Ed. 2d 468 (2011)).  Section 2254(d), as amended by AEDPA, "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Harrington, 562 U.S. at 102, 131 S. Ct. at 786.

Assuming that a petitioner's claims are cognizable on habeas review, a petitioner must exhaust state court remedies before coming to federal court. Exhaustion of state court remedies requires that a petitioner fairly present the claim in state court, allowing the state court the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" See Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L.Ed. 2d 438 (1971)). "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" Jones v. Keane, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997)). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982) (collecting cases).

In addition, a federal court will not review a habeas petition if a petitioner's claims were decided at the state level on "independent and adequate" state procedural grounds. Coleman v. Thompson, 501 U.S. 722, 731-32, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991). This procedural bar applies even if the state court addressed the merits in the alternative, but decided the

claim on independent procedural grounds.  <u>Velasquez v. Leonardo</u>,
898 F.2d 7, 9 (2d Cir. 1990).

    To obtain review of procedurally barred claims, a state
prisoner must show either (1) "cause for the default and actual
prejudice as a result" or (2) actual innocence.  <u>Coleman</u>, 501 U.S.
at 750, 111 S. Ct. at 2565.

II.  <u>Application</u>

    Petitioner argues that: (1) trial counsel was
ineffective; (2) the prosecution failed to disclose <u>Brady</u>
material; (3) newly discovered evidence demonstrates his actual
innocence; (4) the trial court erred by failing to suppress
identification testimony; (5) the trial court's <u>Molineux</u> ruling
deprived him of due process and a fair trial; (6) the trial court's
<u>Sandoval</u> ruling denied him of due process and a fair trial; and
(7) appellate counsel was ineffective.  (Pet., ECF pp. 8-15.)

A. <u>Ineffective Assistance of Trial Counsel Claim</u>

    Petitioner claims he received ineffective assistance
from trial counsel.  He asserts what he perceives as numerous
errors and failures by his trial counsel, including: (1) failure
to discover, develop, and present evidence of third-party
culpability as to Chambers; (2) failure to discover and impeach
false testimony by Detective McHugh; (3) failure to request a
limiting instruction as to <u>Molineux</u> material; (4) failure to object
to improper jury instructions regarding <u>Molineux</u> evidence; and (5)

failure to object to improper comments made during the prosecution summation.  (Pet., ECF p. 4.)

Assuming, but not deciding, that all of Petitioner's claims are not procedurally barred, the Court evaluates the merits of Petitioner's ineffective assistance of counsel claims and finds that Petitioner's claims provide no basis for relief.

As a general principle, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland v. Washington, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065, 80 L. Ed. 2d 674 (1984).  After all, "there are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id.  In reviewing the totality of the evidence, the Court must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 190, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011)).  Bearing in mind this deferential standard, it is no surprise that "the great majority of habeas petitions that allege constitutionally ineffective counsel" fail. Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

To establish deficient performance, Petitioner must prove that "counsel's representation fell below an objective

standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688, 104 S.
Ct. at 2064.   But even if Petitioner can show deficient
performance, he must also establish prejudice--that is, "there is
a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different."
<u>Id</u>. at 694, 104 S. Ct. at 2068.

1. <u>Failure to Adequately Present Evidence of Third-Party
   Culpability</u>

Petitioner argues that trial counsel's failure to
adequately present evidence of third-party culpability constituted
ineffective assistance based on the following alleged issues: (1)
counsel failed to go to the Chase bank where Detective McHugh
claimed Chambers was working at the time of the crime to determine
that there were no female bank managers; (2) counsel failed to
call Chambers as a defense witness; and (3) counsel failed to
obtain and present photographs of Chambers' vehicle.   (Pet., ECF
p. 8.)

In his first motion to vacate his judgment, Petitioner
asserted these arguments to the trial court, and argued that these
failures were the result of trial counsel's lack of a pre-trial
investigation into Petitioner's third-party liability defense.
(<u>See</u> 1st Mot. to Vacate J., ECF pp. 38-40.)   The trial court ruled
that

> [t]he singular thrust of counsel's strategy
> was that someone else, specifically Chambers,

committed this crime.  To that end, he cross-
examined prosecution witnesses, and produced
witnesses on behalf of the defendant.  His
summation continued to maintain that defense.

The fact that photographs of Chambers' car
were never produced does not constitute an
ineffectiveness of trial counsel.  In fact,
the exhibits attached to defendant's motion
reveal that no such photographs exist.  While
Detective McHugh testified that there were
photographs taken, there was very detailed
testimony elicited about the description of
Chambers' SUV . . . [u]pon a review of the
record and counsel's representation of
defendant in totality and at the time of the
representation, this court finds that the
defendant received adequate counsel under
either the federal test of a deficient
performance that prejudiced the defendant or
the more stringent state test of meaningful
representation.

(See May 11, 2011 Order, at pp. 3-4.)

The Court finds that the state court's ruling is not

contrary to, or an unreasonable application of, Strickland, nor is

it based on an unreasonable determination of the facts in light of

the evidence before the state court.  Petitioner fails to establish

either deficient performance or prejudice in his claims related to

his third-party culpability defense.  Strickland, 466 U.S. at 694,

104 S. Ct. at 2068.

Further, it is clear that "counsel has a duty to make

reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary."  Strickland, 466

U.S. at 691, 104 S. Ct. at 2066.  However, a reasonable

investigation does not "compel defense counsel to investigate comprehensively every lead or possible defense, or to scour the globe on the off-chance something will turn up." <u>Greiner v. Wells</u>, 417 F.3d 305, 321 (2d Cir. 2005) (internal quotation marks and citation omitted).

In his first motion to vacate, Petitioner attached an affidavit from an investigator named Irwin Blye, stating that Blye investigated the Chase bank located on Liberty Avenue in Richmond Hill, Queens, and "as best as we could determine," there were two male managers employed at the branch in January 2005, and a female manager employed at the end of 2005.[6]  (1st Mot. to Vacate J., Ex. E, ECF p. 103.)  This Chase bank was the same bank where Detective McHugh testified he believed Chambers told him he was working on January 5, 2005, and where he had spoken to a female bank manager.  (Tr. 1050:1-17; 1st Mot. to Vacate J., Ex. E, ECF p. 104.)  Petitioner argues that had defense counsel gone to the Chase bank himself, he would have learned that there were two male managers in January 2005 and that Chambers' alibi must be false. (Mem. in Supp. of Pet., D.E. 8, at 23.)

Petitioner further contends that had trial counsel interviewed and proffered Chambers as a witness, Chambers would

---

[6] Irwin Blye was an investigator hired by Petitioner after his criminal trial and prior to filing his first motion to vacate his judgment.  (<u>See</u> 1st Mot. to Vacate J., Ex. E, ECF p. 103.)

have testified similarly to his 2017 deposition testimony.[7]  (Mem.
in Supp. of Pet., at 27-28.)  According to Chambers' deposition
transcript, he did not recall telling the police specifically where
he was working on January 5, 2005.  Petitioner once again alleges
that Chambers' deposition testimony refutes Det. McHugh's
Chambers' alibi testimony.

Lastly, Petitioner argues that had trial counsel timely
requested the photographs of Chambers' vehicle, the photographs
could have been presented as evidence at trial, and that failure
to do so constituted ineffective assistance of counsel.

Petitioner is unable to demonstrate either that
counsel's performance fell below the objective reasonableness
standard or that he was prejudiced.  As the trial court noted, the
singular thrust of the defense case was that Amili Chambers was
the actual perpetrator of the crime.  Trial counsel was not
required to present all possible proof of Chambers' guilt at trial.

Further, the aforementioned information allegedly
missing from Petitioner's third-party culpability defense would
not have changed the outcome of Petitioner's trial.  The substance
of both the investigator's affidavit and Chambers' deposition
testimony do not necessarily refute Det. McHugh's testimony

---

[7] Petitioner commenced a lawsuit for libel against Amili Chambers
in 2016, and as a result deposed Chambers on February 22, 2017.
(See generally 2d Mot. to Vacate J., Ex. E, D.E. 14-4, ECF pp.
13-31, and D.E. 14-5, ECF pp. 1-48.)

regarding Chambers' alibi.  It is unclear from Det. McHugh's testimony when he went to the Chase bank to investigate the alibi or who he spoke to, and thus he may have spoken to the female bank manager who worked at the bank in late 2005, according to the investigator's own affidavit.  In Chambers' deposition testimony, which took place twelve years after the crime, he did not recall his exact exchange with the detectives, and did not remember telling detectives where he was working on January 5, 2005.  Also, there was extensive testimony regarding what Chambers' vehicle looked like though no actual photographs were presented as evidence.

    Additionally, it is worth noting that defense counsel may have made a strategic decision by not presenting Chambers as a defense witness.  See United States v. DiTomasso, 932 F.3d 58, 69-70 (2d Cir. 2019) ("Trial counsel's '[a]ctions or omissions . . . that might be considered sound trial strategy,' including decisions not to 'call specific witnesses—even ones that might offer exculpatory evidence—[are] ordinarily not viewed as a lapse in professional representation.'") (quoting United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000)).  It was established at trial that Chambers was six-foot-seven-inches tall, about a foot taller than Petitioner.  Had Chambers testified, the jury would have been able to see that Chambers was unusually tall, and may have discounted the third-party culpability defense.

Accordingly, Petitioner's ineffective assistance of trial counsel claim with respect to his third-party culpability defense is denied.

## 2. Failure to Impeach Detective McHugh

Petitioner claims that trial counsel was ineffective for failing to properly impeach Detective McHugh. Petitioner's support for this claim is similar to his first claim, in that he argues that had trial counsel completed a thorough investigation, he would have had relevant information to properly impeach Detective McHugh's testimony regarding Chambers' alibi. Petitioner asserts that trial counsel should have impeached Detective McHugh with two items of evidence: (1) the information contained in investigator Irwin Blye's affidavit; and (2) that Chambers became defensive when confronted with the siren, refused to allow any further inspection of his 2005 Ford Expedition, and requested an attorney. (Mem. in Support of Pet., at 23-24.) This claim similarly fails.

Petitioner's claim regarding investigator Irwin Blye's affidavit as impeachment evidence is without merit. As stated above, the substance of the investigator's affidavit does not necessarily contradict Det. McHugh's testimony regarding Chambers' alibi, and, thus, Petitioner is unable to demonstrate prejudice.

Petitioner's second argument is premised on defense counsel's possession of information from ADA Biunno's notes, which

are also the subject of his <u>Brady</u> claim. Petitioner's ineffectiveness claim cannot co-exist with his <u>Brady</u> claim, where he argues that it was the prosecution's suppression of the notes that caused Petitioner prejudice. Thus, no amount of investigation on the part of trial counsel would have resulted in locating ADA Biunno's notes if Petitioner's contention is that the notes were improperly withheld under <u>Brady</u>. As such, Petitioner cannot establish that trial counsel's performance was deficient. Further, as discussed in detail herein, Petitioner was not prejudiced by the fact that defense counsel did not have ADA Biunno's notes. Thus, this claim does not survive the <u>Strickland</u> test.

Accordingly, Petitioner's claim that trial counsel was ineffective for failure to impeach Det. McHugh is denied.

3. <u>Failure to Request Limiting Instruction</u>

Petitioner claims that trial counsel was ineffective because he did not request a limiting instruction when <u>Molineux</u> evidence of Petitioner's 1998 Staples robbery was read into the record. (<u>See</u> Pet., ECF p. 8.) This claim is denied.

Petitioner raises yet another claim that falls within the gambit of strategic decisions by trial counsel. "As with trial decisions to offer or stipulate to certain evidence, decisions such as when to object and on what grounds are primarily matters of trial strategy and tactics, and thus are virtually

unchallengeable absent exceptional grounds for doing so." <u>United States v. Cohen</u>, 427 F. 3d 164, 170 (2d Cir. 2005) (internal quotation marks and citations omitted).  By not requesting a limiting instruction at the time that the transcript of Petitioner's testimony was read into the record, defense counsel arguably made a strategic decision to avoid drawing further attention to the evidence.  Thus, Petitioner is unable to demonstrate that defense counsel's performance was deficient.

Further, the trial court read a jury instruction regarding <u>Molineux</u> evidence at the time the jury was charged on the law, and explained the limited purpose for which the evidence should be considered.  As such, Petitioner is unable to demonstrate prejudice.

Accordingly, Petitioner's ineffective assistance claim for failure to request a limiting instruction is denied.

4. <u>Failure to Object to Improper Jury Instruction</u>

Petitioner next claims that trial counsel was ineffective for failing to object to improper jury instructions regarding <u>Molineux</u> evidence.  (Pet., ECF p. 8.)  This claim is denied.

As an initial matter, this claim is absent any explanation as to why the trial court's <u>Molineux</u> jury instruction was improper.  However, in his first motion for writ of error coram nobis, Petitioner argued that trial counsel was ineffective for

failing to object to the intent portion of the trial court's _Molineux_ jury charge.  (_See_ Mem. in Supp. of 1st Writ of Error Coram Nobis, ECF pp. 61-65.)  The essence of Petitioner's coram nobis claim was that the trial court's pre-trial _Molineux_ ruling spoke only of identity as a permissible use of the 1998 Staples robbery evidence, yet the jury charge included that the evidence was also proffered to prove intent, and thus the trial court violated its own pre-trial ruling.  (_See_ Mem. in Supp. of 1st Writ of Error Coram Nobis, ECF pp. 61-65.)

While much of the charge conference was held off the record, trial counsel did object to the trial court's proposed _Molineux_ jury instruction.  (Tr. 1079:23-1080:21.)  Although the trial court did not use specific wording proffered by defense counsel off the record, in response to defense counsel's objection, the trial court expanded the jury instruction rather than read the condensed version of the _Molineux_ charge.  (Tr. 1080:6-18.)  The jury instruction explained that the _Molineux_ evidence was offered to establish Petitioner's identity and intent through evidence demonstrating a particular modus operandi, and that the evidence should only be considered for that limited purpose.  (Tr. 1210:9-16.)  As discussed later, both identity and intent are permissible uses of _Molineux_ evidence.  _Molineux_, 168 N.Y. at 293, 61 N.E. at 294.  As such, the jury charge as read was proper.

Because the Court does not find error with the jury instructions as given in this case, and because trial counsel did note his objection, Petitioner has failed to demonstrate that counsel's performance fell below an objective standard of reasonableness. Additionally, Petitioner is unable to demonstrate a reasonable probability that the outcome of the proceeding would have been different. Had the trial court only instructed on identity, it would not have altered the proceeding; evidence of Petitioner's 1998 Staples robbery would still have been before the jury. The trial court's jury instruction served to limit how the jury could view that evidence. Thus, Petitioner has failed to demonstrate either deficient performance or prejudice.

As such, Petitioner's claim that counsel was ineffective for failure to object to the Molineux jury charge is denied.

5. Failure to Object to Improper Summations Remarks

Petitioner alleges a claim of ineffective assistance for conduct which falls squarely within the purview of trial strategy, and it is denied.

As an initial matter, it is unclear from the Petition what portions of the prosecution summation Petitioner alleges constitute improper commentary. However, based on Petitioner's first motion to vacate his judgment, it appears his claims are based on comments made by the prosecution that relied on both Det. McHugh's testimony regarding Chambers' alibi and the underlying

facts of Petitioner's 1998 Staples robbery conviction.  (See Mem. in Supp. of 1st Mot. for Writ of Error Coram Nobis, D.E. 15-3, ECF pp. 35-36; Aff. in Supp. of 2d Mot. for Writ of Error Coram Nobis, D.E. 15-10, ECF p. 21; Aff. in Supp. of 1st Mot. to Vacate J., D.E. 14, ECF pp. 47-50.)

       "A claim of prosecutorial misconduct during summation requires a court to consider 'whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Torres v. Racette, No. 11-CV-1647, 2018 WL 4762246, at *6 (E.D.N.Y. Oct. 2, 2018) (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2472, 91 L. Ed. 2d 144 (1986)).  Additionally, as discussed supra at 32, when to object and on what grounds are matters of trial strategy and cannot be challenged absent extraordinary circumstances.  See Cohen, 427 F.3d at 170.  To object during the prosecutor's summation may bring unnecessary attention to the remarks, and the decision by trial counsel not to object has been determined to be a reasonable trial strategy.  Broxmeyer v. United States, 661 F. App'x 744, 748 (2d Cir. 2016).

       Here, both instances of alleged misconduct constituted proper summation commentary.  With respect to the 1998 Staples robbery, the trial court's Molineux ruling was proper.  Thus, it was entirely proper for the prosecution to rely on the underlying facts of the 1998 Staples robbery to prove identity and intent.

With respect to the comments made about Det. McHugh's testimony, the evidence does not demonstrate that Det. Chambers' alibi was false.  Additionally, "[p]rosecutors are permitted broad latitude during summation and are permitted to respond to arguments by the defense 'impugning the integrity of [their] case,'" Torres, 2018 WL 4762246, at *6 (quoting United States v. Bautista, 23 F.3d 726, 732 (2d Cir. 1994)).  The entire defense theory was based on Chambers' responsibility for the crime, and as such the prosecution was permitted to rebut that theory by pointing to Det. McHugh's testimony regarding Chambers' alibi.

Accordingly, Petitioner cannot demonstrate that defense counsel's performance was deficient, or that he was prejudiced, and, as such, Petitioner's ineffective assistance of counsel claims are denied on this basis and in their entirety.

B. Brady Material Claim

Petitioner claims he is entitled to habeas relief because the prosecution failed to disclose Brady material. Petitioner alleges that the undisclosed Brady material includes photographs of Chamber's vehicle, police reports, notes made by the police that demonstrated that the police made no attempt to investigate or search for the weapon Chambers was known to have, and notes made by the Nassau County District Attorney's Office that demonstrated that Chambers was evasive when he was interviewed

by the police.  (Pet., ECF p. 10; Mem. in Supp. of Pet., at 28.)
For the following reasons, Petitioner's <u>Brady</u> claim is denied.

Petitioner raised this claim on his second motion to
vacate his judgment pursuant to C.P.L. § 440.10.  (<u>See</u> 2d Mot. to
Vacate J., D.E. 14-3, ECF pp. 20-21.)  However, Petitioner failed
to raise this claim in his first motion to vacate his judgment,
and as such, the court ruled that

> [d]efendant's claims are largely procedurally
> barred . . . defendant unjustifiably failed to
> raise the majority of his claims in his prior
> motion to vacate judgment.  <u>See</u> C.P.L. §
> 440.10(3)(c) . . .  [N]o <u>Brady</u> material was
> withheld from defendant.  Before the trial,
> defendant was indisputably made aware of most
> of the information he now claims was withheld
> from him, and the remaining information that
> defendant erroneously categorizes as
> <u>Brady/Giglio</u> evidence is not material, did not
> exculpate him, and he was not prejudiced by
> the alleged nondisclosure because there is no
> reasonable probability that the result of the
> proceeding would have been different had the
> information been disclosed.

(<u>See</u> Nov. 29, 2018 Order, ECF p. 2.)

Section 440.10(3)(c) of the Criminal Procedure Law
states that, "the court may deny a motion to vacate a judgment
when upon a previous motion made pursuant to this section, the
defendant was in a position adequately to raise the ground or issue
underlying the present motion but did not do so."  C.P.L.
§ 440.10(3)(c).  Thus, Petitioner's present claim is procedurally
barred from review as it was denied by the state court on

independent and adequate state court grounds.  See Murden v. Artuz, 497 F. 3d 178, 192 (2d Cir. 2007).  Further, it is well established that even if the state court also addresses the merits, the claim is still procedurally barred.  See Harris v. Reed, 489 U.S. 255, 264, 109 S. Ct. 1038, 1044, 103 L. Ed. 2d 308 (1989); see also Velasquez v Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

To overcome a procedural bar a petitioner must show either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750, 111 S. Ct. at 2565.  Here, Petitioner has not demonstrated cause for the default or actual prejudice, nor has he demonstrated that failure to consider the claims will result in a fundamental miscarriage of justice, and, thus, he is unable to lift the procedural bar.  Regardless, the Court evaluates Petitioner's claim on the merits.

To prove that a Brady violation occurred, Petitioner must show that the evidence at issue was "favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999).  Here, the Court finds that the state court's ruling with respect to Petitioner's Brady claim is not

contrary to, or an unreasonable application of, United States Supreme Court precedent, nor is it based on an unreasonable determination of the facts in light of the evidence before the state court.  As such, Petitioner's claim is denied.

Petitioner asserts three main pieces of alleged Brady material were withheld: (1) ADA Biunno's file notes regarding Chambers; (2) police paperwork or paperwork from the District Attorney's Office regarding the investigation, or lack thereof, into whether Chambers had a weapon; and (3) photographs of Chambers' vehicle, which was a 2005 black Ford Expedition.  (Pet., ECF p. 10; Mem. in Supp. of Pet., at 28.)

ADA Biunno's file notes stated, in sum and substance, that when a siren speaker was found in Chambers' Expedition he became defensive and "lawyered up," and that an alibi must be established for Chambers.  (See Ex. To 2d Mot. to Vacate J., D.E. 14-4, ECF pp. 3-4.)  Based on Petitioner's defense theory at trial that Chambers was the actual perpetrator, it is understandable that Petitioner would believe that ADA Biunno's file notes are favorable to him.  Additionally, with respect to the suppression prong of the Strickler test, it is unclear from the court's C.P.L. § 440.10 decision whether there was actually a determination about whether this specific evidence was actually withheld from

Petitioner.[8]   See Strickler, 527 U.S. at 281-82, 119 S. Ct. at 1948.

Assuming without deciding that Petitioner's claim survives the first two prongs of the Strickler test, nevertheless, fatal to his claim is the lack of prejudice.  Id.  While Petitioner may not have been in possession of these notations made by ADA Biunno, Petitioner was largely in possession of information relating to Chambers, so much so that the entire defense case was premised on a third-party culpability theory pointing to Chambers. According to Strickler, "there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Id. at 281. Here, the Court does not find that this note would have produced a different verdict in light of all of the information Petitioner possessed regarding Chambers at the time of trial.  Thus, Petitioner has not shown that the trial court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law with respect to ADA Biunno's notes.

_____

[8] The trial court's order stated "no Brady/Giglio material was withheld from defendant.  Before trial, defendant was indisputably made aware of **most** of the information he now claims was withheld from him[.]" (See Nov. 29, 2018 Order, ECF p. 2) (emphasis added.) Thus, it is unclear whether the trial court found that ADA Biunno's file was not withheld from Petitioner, or that regardless, the note itself was not Brady, and thus no Brady material was withheld.

Petitioner also alleges that police paperwork or paperwork from the District Attorney's Office regarding the investigation into whether Chambers had a weapon was withheld. (See Pet., ECF p. 10; Mem. in Supp. of Pet., at 28.)  However, based on the record, it appears that Petitioner was provided with this information.  Prior to trial, Brady materials were provided to defense counsel, including information regarding the investigation into Lead #182, Amili Chambers. (See Affirm. in Opp. to 2d Mot. to Vacate J., ¶¶ 26, 31 and ECF pp. 61, 111-13.) Additionally, at the pre-trial suppression hearing, Detective McHugh testified regarding the investigation conducted regarding Chambers, and spoke about steps taken to determine whether Chambers had a weapon, specifically a gun.  (Hr'g Tr. 176:12-177:6.)  As such, Petitioner cannot demonstrate that this information was suppressed by the State, as required by Strickler, and further, because Petitioner was in possession of the alleged withheld information prior to his criminal trial, he cannot demonstrate that any prejudice occurred.

The last evidence allegedly withheld by the prosecution was photographs of Chambers' 2005 Ford Expedition.  (See Pet., ECF p. 10; Mem. in Supp. of Pet., at 31.)  In Petitioner's first motion to vacate his judgment, and again in this Petition, he alleges that his trial counsel was ineffective for failing to obtain the photographs of Chambers' Ford Expedition and characterized the

photographs as Brady.  (See 1st Mot. to Vacate J., ECF pp. 43-45.)
While the trial court did not rule on the issue of whether the
photographs were Brady material outside the context of
Petitioner's ineffective assistance of counsel claim, the court
did state that "the exhibits attached to defendant's motion reveal
that no such photographs exist." (See May 11, 2011 Order, ECF p.
3.)  Here, Petitioner has not demonstrated that the photographs
themselves were favorable.  Testimony was elicited at trial
regarding the fact that Chambers drove a 2005 black Ford
Expedition, which was similar to the vehicle described by witnesses
as the vehicle involved in the murder.  With respect to the
photographs that were purportedly withheld by the prosecution, or
whether these photographs actually even existed at the time of
trial, it bears little relevance here as Petitioner is clearly
unable to show prejudice.  The testimony elicited regarding
Chambers' vehicle was enough, and there is not a reasonable
probability that the photographs would have produced a different
verdict.

Accordingly, Petitioner's Brady claim is denied in its
entirety.

C. Newly Discovered Evidence Claim

Petitioner claims that he is entitled to habeas relief
because newly discovered evidence demonstrates that he is actually
innocent of the charges in this case.  (Pet., ECF pp. 11-13.)  The

alleged newly discovered evidence includes: (1) evidence that Amili Chamber's alibi was falsified; (2) photographs and other evidence concerning the appearance of Chambers' vehicle; (3) deposition testimony of Amili Chambers; (4) undisclosed police documents and notes; and (5) undisclosed notes from the Nassau County District Attorney's Office. (Pet., ECF p. 11.) For the following reasons, this claim is denied.

In Petitioner's second motion to vacate his judgment pursuant to C.P.L. § 440.10, he raised a claim that he is entitled to a new trial based on newly discovered evidence. (See 2d Mot. to Vacate J., ECF pp. 11-19.) While Petitioner argued in that motion that the new evidence would probably result in an acquittal, such an argument is different from the claim he brings now, specifically that the newly discovered evidence demonstrates his actual innocence. (See 2d Mot. to Vacate J., ECF p. 13; Pet., ECF p. 11.) Assuming without deciding that Petitioner has exhausted his current claim, the Court determines that it fails on the merits. The Supreme Court of Nassau County held that

> defendant's claims of newly discovered evidence are without merit. Defendant has largely failed to satisfy the due diligence requirement with respect to the information he now characterizes as 'newly discovered' evidence, and the information/evidence is generally either not 'newly discovered,' or is offered merely to impeach or contradict the trial evidence (E.B.T. Chambers).

(See Nov. 28, 2018 Order, ECF p. 2.) (citation omitted).

The Court finds that the state court's ruling is not contrary to, or an unreasonable application of, United States Supreme Court precedent, nor is it based on an unreasonable determination of the facts in light of the evidence before the state court.

In this circuit, an "actual innocence claim plays a 'procedural, not substantive' role in [a habeas] case." Hyman v. Brown, 927 F.3d 639, 655 (2d Cir. 2019) (quoting Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012)). "[A] claim of actual innocence must be both 'credible' and 'compelling.'" Rivas, 687 F.3d at 541 (quoting House v. Bell, 547 U.S 518, 521, 538 (2006)); see also Amin v. Hulihan, No. 10-CV-2293, 2016 WL 6068128, at *5 n.6 (E.D.N.Y. Oct. 13, 2016) ("A claim of actual innocence must be supported by 'new reliable evidence' and is therefore 'rarely successful.'") (quoting Schlup v. Delo, 513 U.S. 298, 324, 115 S. Ct. 851, 865, 130 L. Ed. 2d 808 (1995)). "For the claim to be 'credible,' it must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Rivas, 687 F.3d at 541 (quoting Schlup, 513 U.S at 324, 115 S. Ct. at 865). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative,

that more likely than not any reasonable juror would have reasonable doubt.'" Id. (quoting House, 547 U.S. at 538, 126 S. Ct. at 2077); see also McQuiggin v. Perkins, 569 U.S. at 385, 395, 399, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013).

In support of his claim, Petitioner presents evidence including ADA Biunno's notes, investigator Blye's affidavit, and Chambers' 2017 deposition testimony, and generic photographs of 2003, 2004, and 2005 black Ford Expeditions. Because the trial court's ruling was not contrary to, or an unreasonable application of the Schlup standard, Petitioner's claim fails. Schlup, 513 U.S at 324, 115 S. Ct. at 865.

As an initial matter, the majority of what Petitioner presents here is not newly discovered at all, and thus he cannot satisfy the threshold question in Schlup. Certainly Petitioner would have had access to generic photographs of various Ford Expeditions at the time of his criminal trial. Likewise, the information included in investigator Blye's affidavit was available and could have been investigated at the time of trial. Additionally, while Petitioner did not depose Chambers until 2017, Chambers was available prior to Petitioner's trial.

Furthermore, Petitioner cannot demonstrate that purported "newly discovered" evidence makes it more likely than not that no reasonable juror would find him guilty. Clearly, generic photographs of various Ford Expeditions do not exculpate

Petitioner.  Further, the Court has already found that ADA Biunno's notes do not constitute a <u>Brady</u> violation because, ultimately, Petitioner cannot demonstrate prejudice.  While the substance of ADA Biunno's notes demonstrates an instance of Chambers acting defensive, the notes do not exculpate Petitioner.  Similarly, as discussed further <u>supra</u> at 31-32, investigator Blye's affidavit and Chambers' 2017 deposition testimony do not actually falsify Chambers' alibi, or demonstrate Petitioner's innocence.

As such, Petitioner's newly discovered evidence claim fails.

D. <u>Improper Identification Evidence Claim</u>

Petitioner claims that he is entitled to habeas relief on the grounds that the identification procedure was unfairly suggestive.  In support of his claim, Petitioner asserts that he was the only person in both the photo array and lineup, and there was no independent source testimony by eyewitness Giardulo.  (Pet., ECF 13; Mem. in Supp. of Pet., at 38-39.)  Petitioner raised this claim on direct appeal and the Appellate Division denied it, stating that "[t]he hearing court properly denied that branch of the defendant's motion which was to suppress identification evidence."  <u>Gousse</u>, 43 A.D. 3d 958, 958, 841 N.Y.S. 2d 383, 384 (2007) (citations omitted).

The Appellate Division's decision is not contrary to, or an unreasonable application of, United States Supreme Court

precedent, nor is it based on an unreasonable determination of the facts in light of the evidence before the state court.  There is no Supreme Court case supporting Petitioner's contention that the fillers in the photo array must be the same for in the lineup.  It is long established that identification testimony is subject to suppression only when the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968).  Petitioner cannot demonstrate that either the photo array or lineup identification procedures were unduly suggestive.  Accordingly, Petitioner's claim is without merit.

"[A] pretrial photographic identification procedure used by law enforcement officials violates due process if the procedure 'is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" Jarrett v. Headley, 802 F. 2d 34, 40–41 (2d Cir. 1986); quoting Simmons, 390 U.S. at 384, 88 S. Ct. at 971.  As such, a photo array is constitutionally permissible even if there are differences in physical characteristics among the individuals in a photo array, provided that they are not significant enough to suggest the defendant was the perpetrator.  See United States v. Bautista, 23 F. 3d 726, 731 (2d Cir. 1994); United States v. Maldonado-Rivera, 922 F. 2d 934, 974 (2d Cir. 1990) ("The array must not be so

limited that the defendant is the only one to match the witness's description of the perpetrator."); Jarrett, 802 F. 2d 34 at 40–41.

Here, eyewitness Giardulo described the perpetrator to police as a black male, approximately thirty years old, and about five-foot-seven or eight-inches.  Thereafter, Det. McHugh showed Giardulo a photo array on January 20, 2005, consisting of six black males, including Petitioner.  (Hr'g Tr. 25:7-11; 28:2-14.)  While the photo array is not available for the Court's review, there is nothing in the record suggesting that the individuals in the photographs used in the photo array were significantly different in physical appearance from Petitioner, and Petitioner does not argue that they were.  Petitioner's sole argument with respect to whether the identification procedures were unduly suggestive is that the same fillers were not used in both the photo array and lineup.  Thus, there is no evidence that the photo array was unduly suggestive.

"[I]dentification evidence [is] admissible if (a) the [pretrial identification] procedures were not suggestive or (b) the identification has independent reliability." Raheem v. Kelly, 257 F. 3d 122, 133 (2d Cir. 2001).  "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." Raheem, 257 F. 3d at 134.

Giardulo participated in a lineup identification procedure on February 10, 2005. (Hr'g Tr. 88:24-89:12.) Detective Michael Kuhn ("Det. Kuhn") created the lineup and testified that the fillers were black males, in their early thirties, and were of medium build. (Hr'g Tr. 251:1-2.) All of the lineup participants were seated, all participants wore a pale yellow jumpsuit to cover their clothing, a white sheet covered each participant's shoes, and everyone was instructed to look straight ahead. (Hr'g Tr. 252:21-253:23.) Upon viewing the lineup, Giardulo almost immediately identified Petitioner from the shooting on January 5, 2005. (Hr'g Tr. 258:5-15.) Again, the lineup is not available for the Court's review, however, based on the record, there was nothing significant to single out Petitioner as the perpetrator. Thus, Petitioner has not demonstrated that the lineup procedure was unduly suggestive.

While Petitioner argues that there was no independent source evidence from Giardulo, the Court need not reach that analysis. "If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility, and no further inquiry by the court is required." Raheem, 257 F. 3d at 133 (internal citations omitted). Regardless, in an abundance of caution, the Court looks to the factors established by the Supreme Court to determine independent reliability. See Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.

Ct. 375, 382, 34 L. Ed. 2d 401 (1972).  The factors include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382.

Giardulo testified at trial that Petitioner was a few feet away from his front door when he observed him and that the area was well-lit by the lights on his house, as well as his Christmas lights.  (Tr. 301:8-20.)  Giardulo also provided a very detailed description of Petitioner to police, he viewed the photo array fifteen days after the crime, and he observed the lineup over a month later and during both identification procedures he, both quickly and with certainty, identified Petitioner.  As such, based on the totality of the circumstances, there was independent reliability for Giardulo's positive identifications of Petitioner.

Accordingly, Petitioner's identification claim is denied.

E. Molineux Claim

Next, Petitioner's claim that the trial court's Molineux ruling deprived him of due process and a fair trial is denied.

On direct appeal, Petitioner argued that the trial court's Molineux ruling permitting evidence and testimony

regarding his 1998 Staples robbery conviction, and alterations made to his Chevrolet Lumina, denied him his right to a fair trial. (See Appellant. Br., at 32-36.)  The Appellate Division ruled that "[e]vidence of the defendant's conviction arising from his involvement in the '1998 Staples case' was properly admitted to establish his identity as the perpetrator of the instant crime."[9] Gousse, 43 A.D. 3d at 958 (citations omitted).  Petitioner has failed to demonstrate that the Appellate Division's ruling was contrary to, or an unreasonable application of, federal or Supreme Court law, or that it was based on an unreasonable determination of the facts in light of the evidence before the state court.

Pursuant to New York State law, evidence of prior bad acts by a criminal defendant is admissible "to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan . . . ; (5) the identity of the person charged with the commission of the crime on trial."  People v. Molineux, 168 N.Y. 264, 293 (1901).  As a general matter, the admissibility of evidence in state court is wholly a matter of state law and is

---

[9] The Appellate Division decision only references Petitioner's 1998 robbery conviction and does not reference Petitioner's Chevrolet Lumina argument.  Gousse, 43 A.D. 3d at 958. Arguably, however, the Appellate Division found the claim without merit as it affirmed Petitioner's conviction.  See id. Thus, the Court could reasonably apply either AEDPA deference or de novo review, but here it makes no difference as Petitioner's claim is without merit.

therefore not subject to habeas relief, barring a showing that Petitioner's due process rights were denied such that he was deprived a fundamentally fair trial. See Estelle v. McGuire, 502 U.S. 62, 75, 112 S. Ct. 475, 483-84, 116 L. Ed. 2d 385 (1991). More specifically, "[a] habeas claim asserting a right to relief on Molineux grounds must rise to the level of constitutional violation . . . because Molineux is a state law issue." Roldan v. Artuz, 78 F. Supp. 2d 260, 276-77 (S.D.N.Y. 2000) (citations omitted).

"The first step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule would not be unconstitutional." Green v. Herbert, No. 01-CV-1881, 2002 WL 1587133 at *12 (S.D.N.Y. July 18, 2002) (citation omitted); see also Jones v. Stinson, 94 F. Supp. 2d 370, 391-92 (E.D.N.Y).

The trial court ruled, prior to trial, that the prosecution was permitted to present evidence and testimony regarding the 1998 Staples Robbery and the Chevrolet Lumina and Mercedes Benz vehicles, as each were relevant to proving identity. (Tr. 51:8-53:24; 73:17-19.) Pursuant to this ruling, the prosecution read the trial transcript of Petitioner's testimony regarding the 1998 Staples robbery into the record, and presented testimony from Detective Joseph Bello and Frank Kassel, who each

examined the Chevrolet Lumina.  (Tr. 902:3-914:19; see generally 735:1-743:4, 941:1-951:18.)  Both the 1998 Staples robbery transcript and testimony regarding the Chevrolet Lumina demonstrated similarities relevant and probative to Petitioner's identity pursuant to Molineux.

The trial court's ruling with respect to Petitioner's prior bad acts clearly fell within permissible Molineux evidence. The 1998 Staples robbery and Petitioner's Chevrolet Lumina established that Petitioner had a unique pattern, or modus operandi, which demonstrated his identity as the perpetrator. Additionally, the similarities between the 1998 Staples robbery and the facts surrounding Gottlieb's murder helped demonstrate Petitioner's intent and supported the prosecution's theory that Petitioner attempted to rob Gottlieb.  As such, the trial court's ruling was within the limits proscribed by Molineux and state law, and Petitioner has not shown that the trial court's Molineux ruling violated his right to a fair trial.

Therefore, Petitioner's Molineux claim is denied.

F. Sandoval Claim

Petitioner also claims that the trial court's Sandoval ruling violated his constitutional right to a fair trial. Petitioner brought this claim before the Appellate Division, which held that "the [trial] court properly exercised its discretion with respect to its various Sandoval rulings."  Gousse, 43 A.D.3d

at 958 (citations omitted).  As such, the Court applies AEDPA deference to the Appellate Division's decision and finds that Petitioner's claim fails on the merits.

Courts in this Circuit apply "a bright-line rule . . . barring habeas relief for allegedly erroneous Sandoval rulings in instances where a defendant elects not [to] testify." Melendez v. LaValley, 942 F. Supp. 2d 419, 424 (S.D.N.Y. 2013) (quoting Shannon v. Senowski, No. 00-CV-2865, 2000 WL 1683448, at *6 (S.D.N.Y. Nov. 9, 2000)) (ellipsis in original); see also Reid v. Miller, No. 02-CV-2895, 2003 WL 22383097, at *5 (S.D.N.Y. Oct. 20, 2003) ("It is well established that in order to raise a claim for improper impeachment with a prior conviction, the defendant must testify at trial.") (citation omitted).

Here, the prosecution made an application to the trial court seeking to question Petitioner, should he testify, about four prior robbery convictions, including the 1998 Staples robbery that was the subject of the Molineux application. (See generally Tr. 55:2-59:1.)  The trial court held that should Petitioner testify, which he did not, the prosecution could cross-examine him regarding the underlying facts of the 1998 Staples robbery, and the existence of one other robbery conviction. (See generally Tr. 61:18-63:1.)  The trial court would not allow the prosecution to cross-examine Petitioner as to the other two robbery convictions. (See generally Tr. 61:18-63:1.)  Where, as here, the petitioner

does not testify, "a court has 'no adequate non-speculative basis upon which to assess the merits of that claim.'" Sorrentino v. Lavalley, 2016 WL 3460418, at *4 (S.D.N.Y. June 21, 2016) (quoting Shannon, 2000 WL 1683448, at *6).  In any event, the ruling was within the trial court's discretion.  People v. Sandoval, 34 N.Y. d 371, 373, 357 N.Y.S. 849, 852, 314 N.E. 2d 413 (1974).

As such, Petitioner's Sandoval claim is denied.

G. Ineffective Assistance of Appellate Counsel Claim

Finally, Petitioner asserts that he was deprived of effective assistance of appellate counsel.  Petitioner alleges that appellate counsel failed to raise the following arguments on direct appeal: (1) that the prosecution committed prosecutorial misconduct by making improper summation comments; (2) that the prosecution knowingly failed to correct false testimony, and referred to such testimony during summation; (3) that the prosecution violated Brady by withholding photographs of Chambers' vehicle; (4) that the trial court erred by allowing a gun into evidence that was not the actual murder weapon; and (5) that trial counsel was ineffective for various failures.  (Pet., ECF pp. 4, 6-7, 15.)  As discussed below, all of Petitioner's claims are denied.

Ineffective assistance of appellate counsel claims are evaluated using the same framework established by the Supreme Court

58

in Strickland.   See Mayo, 13 F.3d at 533 (citing Strickland, 466
U.S. at 688, 104 S. Ct. at 2064); Mabee v. Phillips, No. 05-CV-
4182, 2009 WL 3644077, at *5 (S.D.N.Y. Nov. 4, 2009).   To show
"that appellate counsel's failure to raise a state claim
constitutes deficient performance, it is not sufficient for the
habeas petitioner to show merely that counsel omitted a
nonfrivolous argument, for counsel does not have a duty to advance
every nonfrivolous argument that could be made."   Mayo, 13 F.3d at
533.   Rather, a petitioner can only "establish constitutionally
inadequate performance if he shows that counsel omitted
significant and obvious issues while pursuing issues that were
clearly and significantly weaker."   Id.

Additionally, in Jones v. Barnes, the Supreme Court
stated that it is up to the professional judgment of counsel to
determine which points to argue and recognized the importance of
"winnowing out weaker arguments on appeal and focusing on one
central issue, if possible, or at most on a few key issues."
Jones, 463 U.S. at 751-52, 103 S. Ct. at 3312-13.

Petitioner raised all these claims in his seven motions
for writ of error coram nobis.   After each motion for writ of error
coram nobis, the Appellate Division denied Petitioner's motions
and ruled that Petitioner had "failed to establish that he was
denied the effective assistance of appellate counsel."   See Gousse,
71 A.D. 3d at 1159, 896 N.Y.S. 2d at 915; Gousse, 98 A.D. 3d at

584, 949 N.Y.S. 2d at 633; <u>Gousse</u>, 110 A.D. 3d at 1100, 974 N.Y.S. 2d at 260; <u>Gousse</u>, 123 A.D. 3d at 848, 996 N.Y.S. 2d at 533; <u>Gousse</u>, 13 A.D. 3d at 955, 20 N.Y.S. 3d at 901; <u>Gousse</u>, 147 A.D. d at 974, 46 N.Y.S. 2d at 800; <u>Gousse</u>, 156 A.D. 3d at 815, 65 N.Y.S. 3d at 793.   The Court does not find that the Appellate Division's rulings are contrary to, or an unreasonable application of, <u>Strickland</u> or <u>Jones</u>, nor are they based on an unreasonable determination of the facts in light of the evidence before the state court.

Accordingly, and as discussed in detail below, all of Petitioner's claims for ineffective assistance of appellate counsel are denied.

### 1. Prosecution Misconduct Claims

Petitioner argues that appellate counsel failed to argue that the prosecution committed three acts of misconduct: (1) the prosecutor made improper summation comments; (2) the prosecution failed to correct false testimony and referred to such testimony during summation; and (3) the prosecution violated <u>Brady</u> by withholding photographs of Chambers vehicle.  (Pet., ECF pp. 6-8.)  Petitioner argues that by failing to bring these claims on direct appeal, he was denied effective assistance of appellate counsel.   For the foregoing reasons, Petitioner's claims are denied.

As discussed supra at 38-39, the prosecutor's comments regarding both Det. McHugh's testimony regarding Chambers' alibi and the underlying facts of Petitioner's 1998 Staples robbery constituted proper summation commentary.

Petitioner's claim that the prosecutor failed to correct, and improperly relied on, Det. McHugh's false testimony regarding Chambers' alibi is similarly without merit. The evidence does not demonstrate that Det. McHugh committed perjury when he testified about Chambers' alibi. As such, the prosecution was not obligated to correct testimony that was not false. Further, the prosecution was permitted to rely on the testimony to rebut the defense's third-party culpability theory.

Additionally, and as discussed supra at 39-45, Petitioner's Brady claim is similarly without merit. As such, the state court's ruling that appellate counsel was not ineffective for failing to raise the Brady claim with respect to the photographs of Chambers' vehicle was not contrary to, or an unreasonable application of, Supreme Court or federal law.

Accordingly, Petitioner's claims that appellate counsel was ineffective for failure to raise claims regarding prosecutorial misconduct are without merit, and are denied.

    2. Fair Trial Claims

Petitioner argues that the trial court erred by: (1) directing that Petitioner's legs be shackled; and (2) admitting a

gun that was not the murder weapon into evidence for demonstrative purposes.  (Pet., ECF pp. 5-7.)  In doing so, Petitioner argues that the trial court denied him his right to a fair trial, and thus appellate counsel was ineffective for failing to raise these two arguments on direct appeal.  (Pet., ECF pp. 5-7.)  Petitioner's claims fail for the following reasons.

At trial, if a defendant is visibly shackled, or if the jury becomes aware that the defendant is shackled, the defendant's right to a fair trial may be violated.  Deck v. Missouri, 544 U.S. 622, 626, 633-34, 125 S. Ct. 2007, 2014-15, 161 L. Ed. 2d 953 (2005).  However, shackling may be unavoidable in certain situations, and, as such, there is a "need to give trial courts latitude in making individualized security determinations." Deck, 544 U.S. at 632, 125 S. Ct. at 2014.  "The court must impose no greater restraints than are necessary, and it must take steps to minimize the prejudice resulting from the presence of the restraints."  Hameed v. Mann, 57 F.3d 217, 222 (2d Cir. 1995) (citing Lemons v. Skidmore, 985 F.2d 354, 356-59 (7th Cir. 1993)).

Here, the trial court referenced two prior incidents of Petitioner attempting escape as justification for shackling his legs during trial, which Petitioner indicated to the court that he understood.  (Tr. 64:7-12.)  It is also evident that the trial court took precautions to prevent the jury from seeing that Petitioner was shackled.  (Tr. 1072:18-22.)  Because the trial

court was justified in shackling Petitioner's legs during the pendency of the trial and took steps to ensure that he was not prejudiced as a result, Petitioner's shackling claim lacks merit. Accordingly, appellate counsel was not ineffective for failing to raise the argument on direct appeal.

Petitioner's demonstrative evidence claim also fails. The admissibility of evidence in state court is wholly a matter of state law and is therefore not subject to habeas relief, barring a showing that Petitioner's due process rights were denied such that he was deprived a fundamentally fair trial. See Estelle, 502 U.S. at 75, 112 S. Ct. at 483-84.  Here, Petitioner does not establish that he was denied a fair trial when the trial court admitted a gun as demonstrative evidence only as he does not argue how he was prejudiced.

Accordingly, Petitioner's claims that appellate counsel was ineffective for failure to argue fair trial claims are denied.

### 3. Ineffective Assistance of Trial Counsel Claims

Here, Petitioner's reasserts his ineffective assistance of trial counsel claims, as discussed supra at 26-39, including: (1) failure to obtain photographs of Chambers' vehicle; (2) failure to impeach Detective McHugh; (3) failure to request a limiting instruction as to Molineux material; (4) failure to object to improper jury instructions regarding Molineux evidence; and (5)

failure to object to improper comments made during the prosecution summation.  (Pet., ECF p. 8.)  For the reasons stated herein, Petitioner's claims that trial counsel was ineffective are without merit, and, as such, appellate counsel was not ineffective for failing to raise these claims on direct appeal.

Petitioner further claims that appellate counsel was ineffective for not addressing the additional failures of trial counsel on direct appeal: (1) failure to make a detailed motion for a trial order of dismissal; (2) failure to object to a photocopy of Petitioner's credit card being admitted into evidence in violation of the best evidence rule; (3) failure to object to Petitioner's legs being shackled; and (4) failure to argue that the trial court erred by precluding defense counsel from cross-examining Detective Carroll regarding Chambers.  (Pet., ECF pp. 5-7, 15.)

Petitioner's claim regarding trial counsel's failure to state a specific ground for his Criminal Procedure Law 290.10 trial order of dismissal motion is without merit.  It is another example of a decision by trial counsel that falls within the gambit of strategic decisions.  See Broxmeyer, 661 F. App'x at 748; Cohen, 427 F.3d at 170.  Therefore, the Appellate Division did not unreasonably apply the Strickland standard here, where appellate counsel was likely to fail by advancing arguments based in trial counsel's strategy.  Thus, Petitioner's claim has no merit.

Likewise, Petitioner's argument that trial counsel failed to object on the grounds of the best evidence rule also fails. In addition to being a strategic decision when to object, the claim itself is without merit. Even if admitting a photocopy of Petitioner's credit card rather than his actual credit card was in error, the error was not of constitutional dimension warranting habeas relief. See, e.g., Lyons v. Girdich, No. 02-CV-3117, 2003 WL 22956991, at * 12 (E.D.N.Y. Oct.15, 2003) (alleged violations of the best evidence rule are evidentiary issues involving state law and are not federal constitutional questions appropriate for habeas review). Thus, Petitioner's claim is denied.

Petitioner's claim regarding cross-examining Detective Carroll clearly has no merit, and thus appellate counsel was not ineffective for failure to argue such a frivolous claim. Petitioner's claim is premised on the fact that the trial court precluded defense counsel from cross-examining Detective Carroll. However, as discussed supra at 12-13, n.4, that is not the case. After the trial court rendered its decision, the parties agreed to a stipulation rather than recalling Detective Carroll. Thus, Petitioner's claim is without merit and it is denied.

Last, Petitioner's claim that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to object to Petitioner's leg shackling is also without merit. Here, the trial court did not err, or deny Petitioner's

65

right to a fair trial, by directing his legs to be shackled during the criminal trial.  As such, Petitioner is unable to demonstrate that he was prejudiced as a result, and thus his claim is denied.

Accordingly, Petitioner's ineffective assistance of appellate counsel claim is denied in its entirety.

<u>CONCLUSION</u>

Petitioner's petition for a writ of habeas corpus (D.E. 1) is DENIED.  The Court declines to issue a certificate of appealability because the Petitioner has not made a substantial showing that he was denied a constitutional right.  <u>See</u> 28 U.S.C. § 2253(c)(2).  The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

/s/ JOANNA SEYBERT
JOANNA SEYBERT, U.S.D.J.

Dated: July   29  , 2020
       Central Islip, New York